601 A.2d 149

**JOHN O.**

v.

**JANE O.**

**No. 714, Sept. Term, 1991.**

Court of Special Appeals of Maryland.

Feb. 6, 1992.

David E. Carey (Gloria Barnhart and Brown, Brown, and Brown, P.A., on the brief), Bel Air, for appellant.

Patrick D. Haskins, Bel Air, for appellee.

Argued before BISHOP, ALPERT and ROSALYN B. BELL, JJ.

ROSALYN B. BELL, Judge.

John and Jane O.[1] were married on April 13, 1963. One child was born of the marriage and was emancipated at the time of these proceedings. They also adopted a son, who at the time of trial was 13 years of age. The parties separated on November 29, 1987. On April 15, 1988, the Circuit Court for Harford County entered a pendente lite order awarding Ms. O. custody of the minor child and exclusive use and possession of the family home and family use personal property located therein.

Trial was held in the Circuit Court for Harford County on July 11–13, 1990. On March 27, 1991, the court issued a judgment which granted the parties an absolute divorce and awarded Ms. O. use and possession of the family home for an additional three years, plus sole custody of the parties' minor child. As of that date, Ms. O. was in possession of the family home by virtue of the pendente lite order of April 15, 1988. In the same judgment, the court also limited Mr. O.'s visitation with the child to "reasonable periods of time during the child's summer vacation and on holidays provided, however, that he shall not be permitted overnight visitation at this time." Limitation on overnight visitation was imposed due to a report by the child that Mr.

---

1. Due to the sensitive nature of the events that occurred in this case, which involve a minor child, we have chosen to use the names John and Jane O. in place of the parties' real names.

O. had touched him in an inappropriate manner during one of the child's previous overnight visits. Also taken into consideration by the court was a psychological evaluation in connection with a charge against Mr. O. in 1982 of perverted practice which was the result of an incident involving a 15 year-old boy. Although the conviction was reversed on appeal, the charge will be discussed later in this opinion.

In addition to the limited visitation, the court ordered Mr. O. to pay Ms. O. a monthly sum equal to the amount of the second mortgage on the family home; ordered that each party retain the personal property in their possession; ordered Mr. O. to pay Ms. O. the sum of $324 per month as child support; ordered Mr. O. to pay $582.50 in attorney's fees to the child's attorney; denied Mr. O. a monetary award; and denied both parties their request for counsel fees.

Mr. O. has appealed, contending the trial court erred in

—passing a second order which extended Ms. O.'s use and possession of the family home and family use personal property for three years, when two years and 11 months earlier, the court granted her the exact same relief, pendente lite;

—failing to consider the factors enumerated in Md.Fam. Law Code Ann. § 8–208(b) (1984, 1990 Cum.Supp.), when it granted Ms. O. use and possession of the family home and family use personal property;

—ordering Mr. O. to pay child support based on his "potential income," when there was no evidence that he had voluntarily impoverished himself;

—denying Mr. O. a monetary award, pursuant to Md. Fam.Law Code Ann. § 8–205 (1984, 1990 Cum.Supp.);

—denying Mr. O. overnight visitation with the parties' minor child based on the "totality of the allegations" against Mr. O. when it made no finding that any of these allegations had merit; and

—finding the interests of the child on the issue of custody were properly represented by the child's court-appoint-

ed attorney who was not present at trial for the taking of evidence and who requested that the court disregard the child's own stated wishes.

We will affirm on all issues except those based on voluntary impoverishment. We will remand for further proceedings to allow the trial court to find or decline to find whether Mr. O. was voluntarily impoverished.

## USE AND POSSESSION OF FAMILY HOME AND FAMILY USE PERSONAL PROPERTY

Mr. O. claims that Ms. O. was awarded use of the family home and family use personal property, pendente lite, in an order dated April 25, 1988. He argues that, under the language of Md.Fam.Law Code Ann. Title 8 (1984, 1991 Repl.Vol.), the court cannot, as a part of its final judgment on March 27, 1991, grant Ms. O. use and possession of the family home and family use personal property for an additional three years. He states that the terms of the statute limit use and possession orders to a total of three years under any circumstances. Mr. O. claims that Ms. O. is not entitled to remain in the family home for an additional three years because she had occupied the family home for two years and 11 months under the pendente lite order.

Mr. O.'s concern with the family use personal property is unwarranted since the order of March 27, 1991 made no reference to a use and possession order of the family use personal property, which had already been divided by the parties. This does, however, leave the use and possession of the family home at issue. Mr. O. contends that for two reasons the trial judge abused his discretion in granting a second use and possession order. First, he argues that Md.Fam.Law Code Ann. § 8–210(c) prohibits the court from issuing a second use and possession order upon the termination of a prior order, regardless of that prior order's duration. Second, Mr. O. claims that the court has no authority to award use and possession of a family home for more than a three-year period.

—The Second Use and Possession
Order Under § 8–210(c)—

■ Mr. O. reads § 8–210(c) to mean that the court may never issue a second use and possession order for the family home. He interprets § 8–210(c) to mean that, once the first use and possession order terminates, the court must classify the home as marital property and consider it in making a monetary award. He claims the court has no other option and bolsters his position by pointing to § 8–209, which limits use and possession orders to the terms, conditions and time constraints set by the court. We find Mr. O.'s interpretation of the statute unduly restrictive and not in keeping with its purpose.

Section 8–210(c) provides in pertinent part:

"(c) **Treatment of Property.**—When a provision that concerns the family home or family use personal property terminates, the court shall treat the property as marital property if the property qualifies as marital property, and adjust the equities and rights of the parties concerning the property as set out in § 8–205 of this subtitle."

Mr. O. points us to no legislative history or case law to support his position. He would have us read § 8–210(c) in a vacuum and without regard to § 8–208, which specifies:

"(a) **Award of possession and use.**—(1) *When the court grants an annulment or a limited or absolute divorce,* regardless of how the family home or family use personal property is titled, owned, or leased, *the court may:*

(i) decide that 1 of the parties shall have the sole possession and use of that property; or

(ii) divide the possession and use of the property between the parties.

"(2) The court *may exercise these powers pendente lite.*" (Emphasis added.)

Section 8–208 is part of subtitle 2 entitled "Property Disposition in Annulment and Divorce." The purpose of

subtitle 2 is set forth in § 8–206, "Family home; family use personal property—Legislative policy" which provides:

> "The court shall exercise its powers under §§ 8–207 through 8–213 of this subtitle:
>
> (1) to enable any child of the family to continue to live in the environment and community that are familiar to the child; and
>
> (2) to provide for the continued occupancy of the family home and possession and use of family use personal property by a party with custody of a child who has a need to live in that home."

Mr. O. would have us read § 8–208 to limit the power of the court to a shorter period than the three years permitted, if a pendente lite order has been issued prior to the granting of a final divorce decree. This would arbitrarily frustrate the avowed purpose of the statute and the three-year period permitted under § 8–210(a).

Section 8–208 cannot, under any possible construction, be read to mean that, if the court makes a use and possession award pendente lite, a final decree terminates that award and no further use and possession order is possible. Under Mr. O.'s interpretation, if the parties separate and a pendente lite order for use and possession is granted and the divorce follows, it would not matter how long the custodial spouse and child had been in the home following separation. The result under Mr. O.'s construction of the statute would be that, even if the custodial spouse and child had been in the home for only a day under a pendente lite use and possession order, the court would have no authority to continue their right to remain in the home. Such an interpretation of § 8–210(c) is utterly inconsistent with the legislative policy set forth in § 8–206.

### —Three–Year Limit—

■ Section 8–210 was originally codified in Md.Cts & Jud.Proc.Code Ann. §§ 3–603 to 3–6A–07 (1974, 1979 Cum. Supp.). Section 3–6A–06 covered the disposition of the family home in a divorce case. The three-year limitation

imposed after granting of a limited or absolute divorce or an annulment was added by amendment prior to the passage of the Act governing Property Disposition in Annulment and Divorce, but did not appear in the original draft. The Preamble to the Act, S.B. 604, ch. 794 at 2304, 1978 Md.Laws states:

> "The General Assembly declares further that it is the policy of this State that when a marriage is dissolved the property interests of the spouses should be adjusted fairly and equitably, with careful considerations being given to both monetary and nonmonetary contributions made by the respective spouses to the well-being of the family, and further, that if there are minor children in the family their interests must be given particular and favorable attention."

Thus, the primary purpose of the Legislature was to provide for the well-being of the minor child, not to set strict time limits on use and possession.

When the court's final order is tacked on to the court's pendente lite order, there is little doubt that Ms. O. and the minor child may occupy the marital home for more than three years. Mr. O. contends that this is error. He argues that the court's power to award use and possession of the family home is limited to a total of three years, even if the award is made under two separate orders. Mr. O. cites no statutory authority for his proposition; instead, he relies on case law in his brief, stating:

> "*See e.g., Hughes v. Hughes,* 80 Md.App. 216, 227 [560 A.2d 1145] (1989) ('[A] use and possession order is limited in duration to three years ...'); *Barr v. Barr,* 58 Md. App. 569, 584–85, 586 [473 A.2d 1300] (1984) (citing the 'three year maximum period of use and occupance of the family home permitted by Cts. Art., § 3–6A–06(e), [now Fam.Law Code Ann., § 8–210(a) ],' and the 'full three years' for which a court may award use and possession)." (Brackets in original.)

Mr. O.'s reference to *Hughes* is inapposite. The quote attributed to *Hughes* appears in a context which clearly

refers to a three-year limitation *following a divorce.*
*Hughes* did not even involve a pendente lite order predating
a divorce. *Hughes* involved a noncustodial parent who had
provided premarital funds toward the purchase of the fami-
ly home and wished to protect his interest. In *Hughes,*
however, we reiterated that "if there are minor children in
the family their interests must be given particular and
favorable attention." *Hughes,* 80 Md.App. at 225, 560 A.2d
1145.

Mr. O.'s reference to *Barr* is even less pertinent. Mary-
land Cts. & Jud.Proc.Code Ann. § 3–6A–06(e) (1974, 1984
Repl.Vol.), which *Barr* referred to and which is the prede-
cessor to Md.Fam.Law Code Ann. § 8–210(a), provided:

"(e) Any provision in any temporary or final order or
decree concerning the family home or family use personal
property is subject to the terms and conditions and limit-
ed to the period of time specified by the court, and is
subject to modification or dissolution by the court, as the
circumstances and justice may require. However, any
such order or decree or any modification thereof concern-
ing the family home or family use personal property shall
be made for a time period not to exceed 3 years from the
date of the granting of the limited or absolute divorce, or
annulment. Nevertheless, if the provision concerning the
family home or family use personal property is a part of
an order or decree incident to a divorce a mensa et thoro,
the provision may not subsequently be extended for an
additional period of time as part of an order or decree
incident to a divorce a vinculo matrimonii."

Thus, the three-year period begins to run from the "grant-
ing of the limited or absolute divorce or annulment." The
sole limitation on the court in granting use and possession
for three years is whether a prior use and possession order
had been entered as part of a limited divorce. Under those
circumstances, the prior order could not be extended for an
additional three years as a part of a later decree for an
absolute divorce. If the Legislature had intended to limit
the use and possession order to three years in all cases—as

it effectively did in an absolute divorce following a limited divorce—it would have specifically set that limitation in § 8–210(a).[2] Section 8–210(a) does not contain such a limitation and we will not interpret the statute in this fashion.

## FACTORS ENUMERATED IN § 8–208(b)

Mr. O. next complains that the trial court failed to consider the factors set forth in § 8–208(b) in making its award for use and possession of the family home and family use personal property.[3] Subsection (b) of § 8–208 provides the court with instructions for making a use and possession determination:

"(b) **Required considerations.**—In awarding the possession and use of the family home and family use personal property, the court shall consider each of the following factors:

(1) the best interests of any child;

(2) the interest of each party in continuing:

(i) to use the family use personal property or any part of it, or to occupy or use the family home or any part of it as a dwelling place; or

(ii) to use the family use personal property or any part of it, or to occupy or use the family home or any part of it for the production of income; and

(3) any hardship imposed on the party whose interest in the family home or family use personal property is infringed on by an order issued under §§ 8–207 through 8–213 of this subtitle."

In the instant case, the judge specifically found that awarding a use and possession order to Ms. O. would be in

---

**2.** We have no way of knowing whether the Legislature considered the possibility that a relatively simple domestic case such as this would take over three years from filing to the entry of a final order, resulting in the loss of use of the family home by one of the parties for over six years. We note that in this case the time lapse was compounded by the trial judge holding the case *sub curia* for almost nine months.

**3.** As discussed previously, no award was made for family use personal property, so we need not address that argument.

the child's best interests, thus addressing § 8–208(b)(1). The court also found that Mr. O.'s immediate plans were to move to California and that Ms. O. was seeking permission to continue to reside in the home. These factual findings indicate that the trial judge considered the interests of each party in continuing to use the family home, thus satisfying § 8–208(b)(2)(i). No evidence was presented by either side concerning § 8–208(b)(2)(ii) as neither party utilized or sought to utilize the property for production of income.

The final element of the § 8–208(b) analysis—namely, hardship—was also addressed by the court. Mr. O. simply does not like the court's conclusion. The court noted that Mr. O.'s only significant complaint with respect to the use and possession issue concerned "his ability to continue to make payments toward the home or for child support because of his financial situation." [4]

The court considered Mr. O.'s financial situation and concluded that he was well educated and was freely choosing to move to California, where he had no firm promise of employment. Depriving Mr. O. of his equity in the house for a few years was not as detrimental as it would have been to force the minor child out of the family home.

We addressed this last point in *Hughes,* 80 Md.App. at 236, 560 A.2d 1145, where the noncustodial spouse made an argument similar to the one Mr. O. makes. We said:

---

4. As part of the order, Mr. O. was required to pay Ms. O. a sum equal to the second mortgage on the family home. Mr. O. does not complain directly about this portion of the order. He only complains that, because he has to make these payments, the use and possession order is a hardship on him.

 The second mortgage was secured to cover expenses resulting from criminal charges against him and some family debts. The trial court suggested the payment was $243 per month, but made no order for the specific payment of $243 per month. The trial court did not specify that the payment was to be made under Md.Fam.Law Code Ann. § 8–208(c), which relates to allocation of financial responsibilities in connection with a use and possession order, although we assume that was the basis. We note that no one has contended any of this constitutes error; hence, we do not reach these issues.

"Although the immediate burden imposed on [the husband] by the court's order may be significant, it is clear that, given [the wife's] limited income, her negligible assets, and the fact that she was denied all alimony, the court was faced with a situation where either the children would suffer the loss of both their home and necessary financial support or [the husband] would have to suffer a three year period of strict financial responsibility. We agree with the circuit court that [the husband] rather than the children should bear the strain of the divorce."

In the instant case, the court was not persuaded and granted Ms. O. the use and possession award, a decision which cannot be termed an abuse of discretion. *See Hughes*, 80 Md.App. at 228–231, 560 A.2d 1145.

### "POTENTIAL INCOME"

Mr. O. next contends that the trial court erred in ordering him to pay child support based on his "potential income," when there was no evidence that he had voluntarily impoverished himself. This contention stems from the fact that the trial court projected Mr. O.'s potential earning capacity in computing his child support obligations. The court found that Mr. O. was capable of employment, but failed to make a specific finding that he was voluntarily impoverished. We will remand for the court to review the facts and make or decline to make that finding. We will discuss the issue for the judge's assistance on remand.

Maryland Fam.Law Code Ann. Title 12 (1984, 1991 Repl. Vol.), sets forth a comprehensive scheme for the awarding of child support to a custodial parent. Subtitle 2 of Title 12 provides guidelines for the determination of the amount of child support. There is a

"rebuttable presumption that the amount of child support which would result from the application of the child support guidelines set forth in this subtitle is the correct amount of child support to be awarded."

§ 12–202(a)(2)(i). Crucial to the determination of the child support award is the "actual adjusted income" of each

party. A determination of the actual adjusted income is based in large measure on each of the parties' actual income. "Actual income" is defined as "income from any source." § 12–201(c)(1). Income is defined in § 12–201(b):

"(b) **Income.**—'Income' means:

(1) actual income of a parent, if the parent is employed to full capacity; or

(2) potential income of a parent, if the parent is voluntarily impoverished."

Thus, § 12–201(b)(2) instructs that a parent's potential income is to be considered "if the parent is voluntarily impoverished." In the instant case, the trial judge made a finding of what Mr. O.'s potential income would be, but failed to make the necessary predicate finding that Mr. O. was voluntarily impoverished.

▮ Neither the Legislature in the statute, nor the courts in the existing case law, have clearly defined what "employed to full capacity" or "voluntarily impoverished" mean. There is no clear definition in any of the Maryland resource materials we consulted.[5] Thus, in order to understand what the term "voluntarily impoverished" means, we must extrapolate from the definitions of the words "voluntarily" and "impoverished." According to *Black's Law Dictionary* 1413 (5th ed. 1979), "voluntarily" or "voluntary" means "[d]one by design or intention; [p]roceeding from the free and unrestrained will of the person; [p]roduced in or by an act of choice...." "Impoverished" or "impoverish" is defined as "to make poor; reduce to poverty or to deprive of strength, resources, etc." *Webster's New World Dictionary of the American Language* 706 (2d

---

**5.** The term "voluntarily impoverished" was added by the House Judiciary Committee just prior to the final passage of the Child Support Guidelines. Prior to the insertion of the term "voluntarily impoverished," § 12–201(b)(2) read "potential income of a parent, if the parent is unemployed or underemployed." By substituting the term "voluntarily impoverished" for "unemployed or underemployed," the Legislature evinced its intention that the courts be able to consider whether a person had purposely taken a reduction in salary to avoid his or her support obligations.

College ed. 1979). Therefore, in the context of a divorce proceeding, the term "voluntarily impoverished" means: freely, or by an act of choice, to reduce oneself to poverty or deprive oneself of resources with the intention of avoiding child support or spousal obligations.[6]

The Maryland courts have taken a variety of facts into consideration to determine whether parents have voluntarily impoverished themselves to avoid their support obligations. For example, in *Colburn v. Colburn,* 15 Md.App. 503, 510–11, 292 A.2d 121 (1972), which was decided prior to the passage of § 12–201, this Court examined an award of alimony to be paid by a husband who resigned as president of his company, claiming ill health; relinquished an annual salary of just under $50,000 for a $10,400 salary as an advisor, while actually continuing to run the company; divested himself of assets by transferring his company stock worth $200,000 to his nephew for one dollar; and by allowing all the corporation's profits to accumulate with no dividend distribution. We upheld the findings of the chancellor that the husband had voluntarily impoverished himself to deprive his wife of her claim for alimony, and the chancellor's subsequent award to the wife based on the husband's earning capacity, or potential income, as opposed to his actual income. *Colburn,* 15 Md.App. at 516, 292 A.2d 121. *See also Chalkley v. Chalkley,* 240 Md. 743, 744, 215

---

6. 24 Am.Jur.2d *Divorce and Separation* § 662 (2d ed. 1983) offers the following:

"Where the obligor spouse has voluntarily relinquished a well-paying practice and has taken a position at a modest salary the court may base the amount of alimony on capacity to earn money, or on prospective earnings. Though an award of alimony may be based on ability to earn as distinguished from actual income, the rule is applied only when it appears from the record that there is a deliberate attempt on the part of the obligor spouse to avoid family responsibilities by refusing to seek or accept gainful employment, willfully refusing to secure or take a job, deliberately not making application to business, intentionally depressing income to an artificial low, or intentionally leaving employment to go into another business."

A.2d 807 (1965); *Kapneck v. Kapneck,* 235 Md. 366, 368, 201 A.2d 798 (1964).

Some of the factors to be considered in determining whether a party is voluntarily impoverished include:

(1) his or her current physical condition;

(2) his or her respective level of education;

(3) the timing of any change in employment or other financial circumstances relative to the divorce proceedings;

(4) the relationship between the parties prior to the initiation of divorce proceedings;

(5) his or her efforts to find and retain employment;

(6) his or her efforts to secure retraining if that is needed;

(7) whether he or she has ever withheld support;

(8) his or her past work history;

(9) the area in which the parties live and the status of the job market there; and

(10) any other considerations presented by either party.

In the instant case, the court found:

"[Ms. O.] has also requested child support in the present case. As has been outlined above, [Mr. O.'s] financial situation is at the very least uncertain. At the time of the hearing of this case he was unemployed with no immediate prospects of gainful employment. [Mr. O.] apparently enjoys *good physical health* and in addition *to his college education* has developed a number of *other skills that should ma[k]e him employable* on the open job market. He is undoubtedly somewhat hampered by the rather strange circumstances which apparently resulted in the termination of his last employment prior to the hearing but there appears to be no reason that he eventually should not become employed. He testified that he has sent out between forty and fifty job applications with no results. It was clear that [Mr. O.] is capable of obtaining employment *and has a potential income of at*

*least $20,000 per year.* Based on that figure, child support guidelines would require a contribution from [Mr. O.] in the amount of $324.00 a month. In addition, this Court believes that [Mr. O.] should pay an amount equal to the amount of the second mortgage on the house. Testimony showed that this mortgage, in the amount of approximately $10,000.00, was taken out to pay off [Mr. O.'s] attorney's fees and various joint marital debts. Although the testimony was somewhat unclear, the amount of this monthly payment appears to be $243.00 per month. Considering [Mr. O.'s] overall ability to work, the combined figures of the child support and the second mortgage appear to be well within his capabilities of paying." (Emphasis added.)

As a general rule, "the amount of a child support award is governed by the circumstances of the case and is entrusted to the sound discretion of the trial judge, whose determination should not be disturbed unless he has acted arbitrarily in administering his discretion or was clearly wrong." *Gates v. Gates,* 83 Md.App. 661, 663, 577 A.2d 382 (1990), quoting *Kramer v. Kramer,* 26 Md.App. 620, 636, 339 A.2d 328 (1975).

In this case, after substantial evidence was presented by both sides, the trial court found that Mr. O. was physically capable, educated, and possessed other skills which would make him employable. The evidence also shows that, although he had tried, for one reason or another Mr. O. had not found or maintained a job on a par with the teaching job he held prior to the criminal charge that was brought against him.[7] The failure of the court, however, to find specifically that Mr. O. voluntarily impoverished himself necessitates a remand.

---

**7.** The criminal charge against Mr. O. was reversed on appeal and a stet was then entered in the trial court. We do, however, recognize that as a condition of the stet, Mr. O. may not teach again in Maryland. This prohibition does not, however, prevent him from using his degree to find a comparable position in a different field.

## A MONETARY AWARD

■ At the close of the trial, the court denied Mr. O. a monetary award. Mr. O. contends that, in so doing, the court (a) improperly valued Ms. O.'s pension; (b) applied the wrong test in deciding whether to grant him a monetary award; and (c) supported its denial of a monetary award with facts not in the record. In considering the monetary award, the court reasoned:

"As stated above, [Ms. O.] was employed by the Board of Education of Harford County from 1959 until 1986, with one or two periods of non-service. At the time of the hearing she was receiving $803.24 a month and a stipulated current value of the pension was $21,483.10. [Mr. O.] wishes a marital award for a portion of this pension. As stated above, a significant portion of the testimony in this case was devoted to an attempt by each party to show that he/she was the innocent/aggrieved party in the marriage and that the breakdown of the marital relationship was attributable to the other side. This Court has already stated that it believes that the ultimate breakup of the marriage was attributable to a number of factors to which both parties contributed. *It cannot be overlooked, however, that for at least four and one-half years during the course of this marriage [Ms. O.] was the sole source of income between the parties while [Mr. O.] attended college. In addition, from 1983 until 1986, [Ms. O.] was the primary source of income for the parties.*

"Weighing the factors set forth in Section 8–205 of the Family Law Article, this Court believes, as stated above, that considering the contribution, both monetary and non-monetary of each party to the well-being of the marriage, the fact that the mental and physical condition of each party is such that they can be self-supporting, the fact that the conduct of each party contributed in some degree to the breakup of the marriage and the fact that the pension was earned exclusively by [Ms. O.] during a period of time that began before the marriage, no marital

award to [Mr. O.] for any portion of [Ms. O.'s] pension is appropriate."

In *Quinn v. Quinn,* 83 Md.App. 460, 464–65, 575 A.2d 764 (1990), this Court said:

"In determining an equitable distribution of marital property, Maryland courts are required to engage in a three-step process. First, all property owned by the parties must be categorized as either marital or nonmarital. Second, the marital property must be valued. Finally, the court may make a monetary award. Failure to comply with the three-step process requires that any monetary award be vacated.

"In determining the amount and method of payment of the monetary award, the court must consider the statutory factors enumerated in Md.Fam.Law Code Ann. § 8–205(b). The failure to consider the statutory factors also requires that any monetary award be vacated." (Citations omitted.) (Footnote omitted.)

### —Value of Ms. O.'s Pension—

The parties stipulated to the accuracy and authenticity of a letter from the Maryland State Retirement Agency regarding Ms. O.'s pension. The letter indicated the amount that Ms. O. was receiving monthly from her pension ($803.24), the portion of that amount that was paid into the pension by her ($195.34), Ms. O.'s life expectancy (24 years), and the annual cost of living allowance that the pension is subject to (four percent).

Mr. O. contends the trial court erroneously stated that the parties stipulated that the pension had a current value of $21,483.10. We agree that the court incorrectly characterized what occurred. In light of the overall analysis the court undertook, however, we find this characterization to be harmless.

Mr. O. then argues that the $21,483.10 value placed on the pension by the court is not an accurate valuation. He states the $21,483.10 figure only represents the amount of

Ms. O.'s contribution to the pension, as of February 9, 1990. This is not precisely correct. The letter from the State Retirement Agency states that the unused balance as of that date was $21,483.10. That is the only value figure offered to the court. If Mr. O. sought a different valuation, it was his burden to establish one.

Mr. O. argues that the analysis the court used was the "contribution plus interest" method which this Court recently held is not appropriate in valuing pensions which have already vested and which include a significant employer contribution. *Imagnu v. Wodajo,* 85 Md.App. 208, 217–20, 582 A.2d 590 (1990). As in *Imagnu,* the instant case involves a pension which has vested and which includes a significant employee contribution and an even greater employer contribution. On this basis, Mr. O. contends we should reject, as we did in *Imagnu,* such a "contribution plus interest" method of valuation. We find Mr. O.'s contention disingenuous.

In *Imagnu,* the trial court accepted a "contribution plus" valuation instead of an "alternate valuation" presented by an economist, based upon the then present value of the pension, taking into account both employer and employee contributions. In the instant case, Mr. O. presented no alternate valuation.

Mr. O. attempts to place the burden upon the trial court to reach a value different than the unused contribution value set out in the letter from the State Retirement Agency. Since Mr. O. presented no alternative evidence as to the value of the pension, the only basis for the pension was that set out in the letter. § 8–205. The trial court did not abuse its discretion in accepting the only evidence presented to it with respect to the value of Ms. O.'s pension.

█ Finally, with respect to the monetary award, Mr. O. complains that the trial judge did not value the assets as required by § 8–204. Mr. O. contends that part of the pension was nonmarital and the trial judge failed to make a finding as to which part was marital. Actually, Mr. O.

stood to benefit from that finding since the trial judge considered the pension as totally marital. Again, the trial judge was not given sufficient information to make a determination of what was marital and what was nonmarital. The letter from the State Retirement Agency, which was the sole source of the information on the value of the pension, listed 176 months of service. Ordinarily, this would have sufficed to make a determination as the trial judge had the date of retirement, October 1, 1986, and the date of the marriage. The report, however, also listed "purchased 74 months" and "sick 8 months." The trial judge could have no way of determining whether the purchased months were marital or nonmarital, whether the "sick" months were marital or nonmarital, or whether the purchased and "sick" months were subsumed in the 176–month total. While the trial judge is required to make a determination of what is marital property and its value, he must be realistic. He could have considered appointing his own economist, but in view of the financial condition of the parties, this could not be justified economically. Arguably, Mr. O. waived any right to contest the valuation since he offered no contrary evidence. Moreover, it would not serve Mr. O.'s cause to decide that any portion was nonmarital. Mr. O. was not prejudiced either by his failure to offer any contrary evidence, or by the court's failure to make a finding that a portion of the pension was nonmarital.

—The Test in Deciding Whether to
Grant a Monetary Award—

■ The factors used in determining the amount and method of payment or terms of property transfer are set forth in Md.Fam.Law Code Ann. § 8–205(a) & (b).[8] Mr. O. contends these factors are to be considered only *after* an

---

8. Section 8–205(a) & (b) provide:
 "(a) **Grant of award.**—Subject to the provisions of subsection (b) of this section, after the court determines which property is marital property, and the value of the marital property, the court may transfer ownership of an interest in a pension, retirement, profit sharing, or deferred compensation plan from 1 party to either or

award has been deemed appropriate and the court is "determining amount and method of payment or terms of transfer." § 8–205. Mr. O. argues that the factors in § 8–205 should *not* be considered in deciding *whether* to grant a monetary award. He cites *Holston v. Holston*, 58 Md.App. 308, 318, 473 A.2d 459 (1984), to bolster his position. In *Holston*, 58 Md.App. at 318, 473 A.2d 459, quoting *Ward v. Ward*, 52 Md.App. 336, 339, 449 A.2d 443 (1982), we said: "Once the chancellor decides to make a monetary award, he *shall* then consider each of the nine factors" in § 8–205(b) (emphasis in original). Mr. O. takes the position that, having determined that particular property is or is not marital and placing a value on it, the court has already determined that an award is or is not appropriate.

---

both parties, grant a monetary award, or both, as an adjustment of the equities and rights of the parties concerning marital property, whether or not alimony is awarded.

"(b) **Factors in determining amount and method of payment or terms of transfer.**—The court shall determine the amount and the method of payment of a monetary award, or the terms of the transfer of the interest in the pension, retirement, profit sharing, or deferred compensation plan, or both, after considering each of the following factors:

(1) the contributions, monetary and non-monetary, of each party to the well-being of the family;

(2) the value of all property interests of each party;

(3) the economic circumstances of each party at the time the award is to be made;

(4) the circumstances that contributed to the estrangement of the parties;

(5) the duration of the marriage;

(6) the age of each party;

(7) the physical and mental condition of each party;

(8) how and when specific marital property or interest in the pension, retirement, profit sharing, or deferred compensation plan, was acquired, including the effort expended by each party in accumulating the marital property or the interest in the pension, retirement, profit sharing, or deferred compensation plan, or both;

(9) any award of alimony and any award or other provision that the court has made with respect to family use personal property or the family home; and

(10) any other factor that the court considers necessary or appropriate to consider in order to arrive at a fair and equitable monetary award or transfer of an interest in the pension, retirement, profit sharing, or deferred compensation plan, or both."

Mr. O. does not seem to grasp the interplay between the three required steps in determining a monetary award. In steps one and two, the judge determines what is marital property and places a value on it. In step three, the monetary award is made by utilizing the factors in § 8–205. Steps one and two are necessary to ascertain the relative economic circumstances of the parties and if there is any marital property that may be the source of an adjustment. Step three sets forth the process to be followed to determine whether an adjustment is indicated and the amount and method of payment. *Melrod v. Melrod*, 83 Md.App. 180, 185, 197, 574 A.2d 1, *cert. denied*, 321 Md. 67, 580 A.2d 1077 (1990); *Quinn*, 83 Md.App. at 464–65, 575 A.2d 764. Based on weighing those factors, the amount to be awarded may be, and in this case was, zero.

—Factors Considered—

■ Despite his basic argument in this case that the court, after determining what is marital property and placing a value on it, must make a monetary award, Mr. O., perhaps hedging his position, proceeds to analyze four of the factors considered by the court. He contends they do not support the court's decision and in some instances are not supported by the record.

The trial judge need not articulate each item or piece of evidence she or he has considered in reaching a decision. In the instant case, the trial judge stated that he had weighed each factor set forth in § 8–205 in making his determination on the marital property issue. Unless it is clear that he or she did not, we presume the trial judge knows and follows the law. *Lapides v. Lapides*, 50 Md.App. 248, 252, 437 A.2d 251 (1981). The fact that the court did not catalog each factor and all the evidence which related to each factor does not require reversal.

Mr. O. makes much of the statement by the trial judge that "for four and one-half years during the course of this marriage [Ms. O.] was the sole source of income between the parties while [Mr. O.] attended college." Mr. O. claims

this indicated that the trial judge did not consider the nonmonetary contributions made to the marriage by the parties.

While the court's statement may have been overbroad, there is no doubt that the family living expenses during that period were primarily covered by Ms. O.'s earnings. The argument that this shows the court ignored nonmonetary contribution is not entirely correct. The comment made by the court more realistically reflected that during this period Ms. O. produced most of the monetary contributions and performed most of the nonmonetary contributions in the household.[9] Both Ms. O. and the parties' adult daughter testified that Ms. O. took care of most of the household chores. Ms. O. also testified that she had primary responsibility for the care of the children, including making sure that they got to their music lessons and sports events, making sure that they did their homework and, in general, nurturing them as they grew. Mr. O. does not dispute this and admits that he let Ms. O. and their daugh-

---

**9.** The trial judge in this case took a realistic look at the position of the parties and their respective contributions. Ms. O.'s contributions, which were both monetary and nonmonetary, exemplify the comments of Susan Moller Okin, in her book *Justice, Gender, and The Family*, 153 (1989), in which she takes a new look at what she calls "gender-structured marriage." Okin writes:

"[W]hile the distribution of paid labor between the sexes is shifting quite considerably onto women, that of unpaid labor is not shifting much at all, and 'the couple that shares household tasks equally remains rare.' ... Even unemployed husbands do much less housework than wives who work a forty-hour week...."

Mr. O. claims that the court ignored his nonmonetary contributions made during the time that he was attending college to get his bachelor's degree. What the court really did, however, was to take into account the fact that Ms. O. was doing the majority of the work both outside and inside of the home during this time. Ms. O.'s contributions during the time Mr. O. was in school are not uncommon. Okin found, at 156, that

"[e]ven when a wife maintains her career, her husband's work needs—in terms of time, freedom from other preoccupations, education and training, and geographical mobility—usually take priority."

Such was the case in John and Jane O.'s household and the trial judge merely took notice of that fact. We perceive no error in his approach.

ter do most of the household chores, although he stated that he would help out occasionally.[10]

Mr. O. contends that the court's finding that his condition is such that he can be self supporting without a marital award is inconsistent when one considers the court's earlier findings that Mr. O. "faced a very uncertain future," "was unemployed with no immediate prospects of gainful employment," and that his "ability to ... adequately provide for [his] child[ ] is in question." We find no such inconsistency. The tenor of the court's findings is that he had the ability and education to find employment, but had failed to do so and, until he put his life in order, he did face "a very uncertain future."

At the time of trial, Mr. O. had made a unilateral decision to move to California with no certainty of employment or support. The record was replete with testimony on the monetary issues and the court's determination that an equitable adjustment was not mandated was not clearly erroneous based upon the evidence before it. Rule 8–131(c).

## OVERNIGHT VISITATION

Mr. O. also contends the court was overly restrictive in denying overnight visitation based upon the evidence presented. The trial court heard a plethora of evidence concerning Mr. O.'s fitness for custody. All the testimony, other than that of Mr. O. himself, indicated that, prior to the divorce proceedings, Mr. O. took very little interest in his children and was estranged from his emancipated daughter.

The primary root of the court's concern and the ultimate basis for the restrictive visitation was evidence of sexually inappropriate conduct on Mr. O.'s part, and a report that

---

10. We note that Mr. O. stated that he took the responsibility for the maintenance and upkeep of the exterior of the home and the parties' automobile. In addition, we acknowledge but refuse to comment on the fact that Mr. O. complained during the trial that Ms. O. did not keep a tidy home.

indicated his pedophilic predilections.[11] Then, shortly after the parties' separation, their minor son reported to his sister that during a visit Mr. O. had sexually molested him. The child repeated his account to a Department of Social Services social worker. Admittedly, the child later recanted the allegation of sexual misconduct by Mr. O. This type of recantation in a custody dispute is not, however, uncommon.

Elaine D. Ingulli, in *Trial by Jury: Reflections on Witness Credibility, Expert Testimony, and Recantation*, 20 Valparaiso L.Rev. 145, 168–69, (Winter 1986), wrote:

"In a handful of states, expert psychological testimony about the credibility of children has already been found admissible in one kind of case: cases involving child-witnesses who are victims of sexual abuse by a family member. In those cases, experts have been permitted to testify about the typical response of a child who has been sexually abused by a family member. Such testimony is critical . . . since there is very good evidence that children frequently recant their own (true) reports of such abuse.

---

**11.** In 1982, while he was a school teacher, Mr. O. was charged with performing a sexual act with a 15-year-old boy. He was convicted, but the case was appealed to this Court and in an unreported decision we set the conviction aside. The case against him was ultimately stetted and, from what we understand, conditioned upon treatment. Even though Mr. O. no longer has a conviction on his record, the trial judge had the right to consider the incident in determining whether visitation was appropriate. *Queen v. Queen*, 308 Md. 574, 587–88, 521 A.2d 320 (1987). *See also Montgomery County v. Sanders*, 38 Md.App. 406, 420, 381 A.2d 1154 (1978).

While the court did not specifically rely on Md.Fam.Law Code Ann. § 9–101 (1984, 1991 Repl.Vol.), that statutory provision could also be utilized to support the court's determination. Section 9–101 provides:
 "(a) **Determination by court.**—In any custody or visitation proceeding, if the court has reasonable grounds to believe that a child has been abused or neglected by a party to the proceeding, the court shall determine whether abuse or neglect is likely to occur if custody or visitation rights are granted to the party.
 "(b) **Specific finding required.**—Unless the court specifically finds that there is no likelihood of further child abuse or neglect by the party, the court shall deny custody or visitation rights to that party, except that the court may approve a supervised visitation arrangement that assures the safety and the physiological, psychological, and emotional well-being of the child."

A respectable body of social science literature on the problems of incest and intra-familial child sexual abuse explains the typical behavior patterns that can be expected in such cases, and that many incest victims are reluctant to report their experience for fear of being blamed or punished, or of causing the break-up of the family, or of not being believed. Contrary to the assertions of Wigmore and Freud, children seldom lie or fantasize about sexual abuse. Instead, many experts believe that many children who suffer assault actually under-report the amount and type of abuse, or fail to report it because the consequences of telling seem worse than the consequences of being victimized again." (Footnotes omitted).

While Ingulli's comments were made primarily in the context of criminal prosecutions, they are equally applicable to situations such as the one now before us.

In the instant case, the court had before it the reports of Louise Russell, a social worker, who had been working directly with the child. Her reports supported the original report by the child of sexual molestation and suggested reasons for the recanting. These reasons included a delay in getting the child help through the Department of Social Services and the child's need to prove to himself and others that his father would not abuse him again. In addition, Russell felt that the child was seeking approval from his father by aligning with him. Russell in her report urged that the child not be allowed to control the decision-making process and "[the child] needs to know that the professionals have determined the outcome."

In reaching his decision, the trial judge noted the testimony of Ms. O.'s brother concerning a sexual touching incident of him by Mr. O. The court also considered the incident which gave rise to the criminal charge against Mr. O. Also before the court was the testimony of a court-appointed social worker, Ann Matukaitis, and a report by a court-appointed psychiatrist, Jonas Rappaport. Ms. Matukaitis had been appointed by the court to issue a report and recommendation concerning the custody/visitation issue

during the pendente lite phase of the case. Ms. Matukaitis related incidents she actually witnessed of what she deemed "inappropriate touching" during a session with Mr. O. and the child. Such conduct before a court-appointed professional was probative on the issue of visitation.

Dr. Rappaport's report, which was the result of the criminal episode involving Mr. O., also raised serious questions concerning the propriety of Mr. O.'s visitation with his son. Dr. Rappaport concluded that Mr. O. was a pedophile with an apparent preference for boys in their early teens. The doctor specifically stated that the parties' son might be at risk once he reached this age group. His report must also be taken into consideration when reviewing the court's ruling. There was evidence showing "reasonable grounds to believe" that the child had been abused and no direct finding by the court that "there is no likelihood of further child abuse." We hold the court's findings with respect to overnight visitation were far from clearly erroneous.

Mr. O. further complains that, since he planned to move to California, the restriction against overnight visits effectively cut off any relationship he had with the child. Since Mr. O. has no employment in California and no particular reason to move there, except his own personal desire, we cannot keep from commenting that it is not the trial judge who effectively cut off any relationship with the child, but Mr. O. himself. Mr. O. also contends all the allegations made against him were rebutted.[12] The allegations may

---

**12.** Mr. O.'s psychiatrist, Dr. Daniel S. Pearl, in a letter dated April 26, 1989 concludes:

"In the time that I have known Mr. [O.], he has most fervently denied any desire to engage in sexual behavior with minors of either sex. He denies any wrongdoing in regard to his son and does have a clear sense that sexual activity between adults and children is wrong. I understand that Mr. [O.'s] wife and/or daughter have accused Mr. [O.] of being homosexual, and have tried to instill in his son a fear of AIDS in an obvious attempt to impair the father-son relationship. This has been quite painful for Mr. [O.] who describes a warm and loving relationship between himself and his son.

have been rebutted, but the trial judge, sitting as the trier of fact, need not and did not credit or rely upon that rebuttal. Certainly, he did not credit it sufficiently to permit the minor child to be subjected to what can only be characterized as a serious risk. The trial judge had substantial evidence before him from which he could determine the child was at risk. Despite that risk, we note that the trial judge did not require supervised visitation. The court on remand may wish to take another look at the situation, as it currently stands, to see whether supervised visitation is indicated.

## THE COURT–APPOINTED ATTORNEY

 Finally, Mr. O. contends that the absence of the child's attorney during the taking of testimony and his failure to advocate the child's expressed desire to live with his father mandate reversal of the court's custody determination. We do not agree.

Counsel for the child requested that he be excused during the taking of testimony and both parties agreed. Moreover, the child indicated he did not oppose the absence of his attorney during that phase of the trial. Mr. O. cannot raise the issue before this Court for the first time. Rule 8–131(a).

 Mr. O.'s second attack on the child's counsel is his failure to advocate the position adopted by his client. Counsel was appointed to represent the minor child's interests in the case pursuant to Md.Fam.Law Code Ann. § 1–202 (1984, 1991 Repl.Vol). The purpose of § 1–202 is to afford the court an opportunity to hear from someone who will "speak on behalf of the child." *Levitt v. Levitt,* 79 Md.App. 394,

---

"In regard to his current situation, Mr. [O.'s] mood is stable and his level of functioning is good. There has been no recurrence of a major depressive episode. He continues to be seen weekly by [a different therapist] and uses therapy in a productive way, focusing on intrapersonal issues and ·the psychodynamics of his relationships."

404, 556 A.2d 1162, *cert. denied*, 316 Md. 549, 560 A.2d 1118 (1989). Counsel is responsible for providing the court with an independent analysis of the child's best interests, not advocating either parent's position. Mr. O. contends "the child's attorney did nothing to represent the child's views." That simply is not true.

Counsel made it clear in comments to the court and in his letter following trial that the child wished. to be in the custody of Mr. O. This position was also made clear by the child himself in his interview with the court and such feelings were acknowledged by the court in reviewing the evidence. The child's position was fully presented to the tribunal.

Mr. O.'s real complaint is not the presentation of the child's position, but the fact that counsel for the child did not advocate that custody be granted to Mr. O. Counsel's letter of July 23, 1990 to the trial judge articulated the concerns raised by the evidence presented and the reasons why counsel demurred from urging the child's desires as being in his best interests. The child's views are to be considered by counsel, but are not necessarily controlling. *See* Comment, Rules of Professional Conduct, Rule 1.14. Counsel's position is bolstered by the recommendations of Russell who, in her final report prior to leaving the agency, stated that it was imperative that the child understood that it was the professionals and the judge who would decide the ultimate outcome. While the child's views were adequately presented to and considered by the court, the court chose not to accede to those wishes in light of the overwhelming evidence to the contrary. We perceive no abuse of discretion.

JUDGMENT AFFIRMED IN PART; CASE REMANDED IN PART WITHOUT AFFIRMANCE OR REVERSAL FOR FURTHER PROCEEDINGS IN ACCORDANCE WITH THIS OPINION.

COSTS TO BE PAID FIVE–SIXTHS BY APPELLANT AND ONE–SIXTH TO ABIDE THE RESULTS OF FURTHER PROCEEDINGS.