## MARLENE S. DRAPER (BOETKER) *v.* DAVID W. DRAPER

[No. 472, September Term, 1977.]

*\*Decided March 9, 1978.*

---

* *Reporter's Note:* Unreported opinion previously filed on January 24, 1978; recalled by Order dated March 9, 1978 for refiling as reported opinion.

The cause was argued before THOMPSON, MOORE and COUCH, JJ.

*John C. Eidleman* and *Elizabeth S. Baker* for appellant.

*Albert Gallatin Warfield, III,* for appellee.

MOORE, J., delivered the opinion of the Court.

In this child custody case, the natural mother has appealed from an Order of the Circuit Court for Anne Arundel County (Beardmore, J.) for modification of a decree of divorce between appellant and appellee under the terms of which the mother received custody of a child, Jennifer, born on March 19, 1972. Several assignments of error are made. Determinative of this appeal, however, is our conclusion that the chancellor, acting prior to the decision of the Court of Appeals in *Davis v. Davis,* 280 Md. 119, 372 A. 2d 231 (1977), applied an improper standard in changing custody from the mother to the father. We accordingly reverse and remand for further proceedings consistent with this opinion.

· I ·

The parties were married in Hagerstown, Maryland when the mother was 15 years of age and the father 17. Their baby,

Jennifer, was born less than two years later, on March 19, 1972. The parties separated in March 1973, Jennifer remaining with the mother. They were divorced in January 1975 and in the same month, the mother married a close friend of her former husband and resided with him in Pensacola, Florida, where he was on duty with the United States Navy. The second husband was thereafter transferred to Alaska. During his absence, the wife learned that he had had an affair with another woman and, out of bitterness, according to her testimony, she herself had an affair with another man. This liaison lasted approximately one month and a half. The natural mother of the child later took up residence in Syracuse, New York with another man, but separated from him when he was arrested and ultimately convicted of criminal charges involving breaking and entering.

The natural father of Jennifer filed a petition for modification of the divorce decree on May 14, 1976, asserting that the mother was not a fit and proper person to have custody "as she has been living with a series of different men; she is flighty [,] promiscuous, unwholesome for the child and subjects the child to a bad environment." A custody investigation was later requested. On August 21, 1976, prior to any court proceedings under the petition for modification, the wife's former husband, her present husband, and two other men entered her apartment in Syracuse, New York and spirited away the child. The wife immediately filed a petition for contempt and an order was entered by the Circuit Court (Wray, J.) requiring the natural father to return the custody of the child to the mother forthwith.

The Department of Social Services of Anne Arundel County submitted a report of the custody investigation dated November 17, 1976, prepared by Judith Finn, a social worker. The report recommended that custody of Jennifer be awarded to the father, David Draper, with reasonable rights of visitation to the mother, Marlene Boetker.[1]

---

1. As stated *infra,* the report was received in evidence during the husband's case. The wife's counsel called Miss Finn but was not permitted to cross-examine her.

In support of the petition for modification, the natural father was the principal witness. (The aunt of the natural mother was also called by counsel for the father and was examined as a hostile witness but gave no substantive testimony.) The father testified that he was regularly employed as a plumber and resided in a two-bedroom apartment; that because of his daytime employment he would require a child care program for Jennifer and was prepared to arrange for such. He agreed on cross-examination that she was a playful, intelligent and normal child and had always been in the mother's custody. He claimed, however, that his visitation with the child had been limited by the natural mother, and that she was not a fit and proper person to have continued custody.

The mother, Marlene, took the stand in her own behalf and also presented the testimony of her husband, Gary Boetker, from whom she was separated,[2] her mother and father, with whom she and Jennifer had been living since November 1976, her aunt, Mrs. Tawney, whom appellee had endeavored to interrogate as a hostile witness, and a friend, Mrs. Dawn Bruns, the mother of a 15-month old child. The latter witnesses testified that the child, Jennifer, was normal, happy, and well-cared for, and that the mother was a fit and proper custodian. The testimony of three other witnesses to the same effect was also proffered.

In the course of the wife's testimony, she stated that the natural father had been neglectful of the child on an occasion when she was seriously sick with a temperature and on other occasions when he preferred the company of his contemporary male friends outside the home, and that he did not consistently adhere to the child support requirements, namely, $25 per week, specified in the decree of divorce. She acknowledged the immorality of her past living situation, saying: "It was wrong. You know, at the time I had a lot of things in my head, but it was wrong and I could lose my daughter. I know that now, too. And I don't want to." It was brought out that she had undergone a hysterectomy at age

2. Mr. Boetker testified that he was still in love with his wife and was hopeful of a reconciliation.

21 and was therefore incapable of further child-bearing. She described Jennifer as a "very smart" child who rarely required correction and stated that she was amenable to liberal visitation of the child by her father.

## II

At the conclusion of the testimony, the chancellor delivered an oral opinion from the bench. In reaching the conclusion that custody of the child should be changed, he stated at the outset of his opinion:

> "*The Court relies heavily on the report of Judith Finn and the Department of Social Services dated November 17, 1976. It reads from page ten thereof, the report being incorporated in toto in the Court's opinion,* on page ten is stated 'Our discussion with the parties, Jennifer, relatives and references suggests that Jennifer is physically healthy, alert and bright. Although she has not been left unsupervised, we question the quality of the supervision and the environment provided. The child is extremely outgoing and demanding of adult attention. We find her to be confused about her own family structure at home. She has been subjected to long periods of separation from her father and a series of men in her mother's life. We have grave concern for Jennifer's later ability to form deep personal relationships and family bonds.' Now, this is what bothers the Court. The Court has to take into consideration as it is doing what is for the best interest of the child. *Now, the Petition to Modify the Decree in this case was filed on May 14, 1976 and from that date forward it appears that the [mother], Marlene Boetker adopts a lack of promiscuity. Before that date, however, there had been an in-bed, out-of-bed with several men and it does not redound to her credit to observe that this must have had an adverse effect on young Jennifer.* It certainly did, as the Court read from the report, contribute to her confusion and the lack of ability to discern her

position in the family group. Stability of the family group is of course essential in this day and age. All the more so because our population is expanding and there is less elbow room for all of us. It is important that stability be found in the family group to cut down the amount of conflict that ensues therefrom. Now, I'm not going to ask for an update of this report because I believe as Mr. Kerpelman stated, that the report served as a snapshot of what the situation was back there in November." (Emphasis added.)

Thereafter, addressing himself to the legal effect of the wife's immoral conduct, the chancellor stated:

"It is true that when the Court is convinced that the promiscuous relationship is terminated and that the parties are no longer undergoing a sexual relationship and that there is a repentence on the part of the parent, that the Court will keep the award of the child with the repentent parent, however, the Court is not convinced that that has occurred here. The attempt to put on a good case, as it were, by showing that she now exhibits excellent care for the child and that she is not running around with other men it seems to the Court results from the filing of the Petition to Modify the Decree and any request for a further update is going to do nothing more than to put the respondent or the non-petitioner, Mrs. Boetker on notice that she has to maintain her good conduct for a further period of time and to continue her lack of promiscuity. *So it is on the basis of her past conduct which is not promising at all that the Court sadly it might say awards the child to the father.* In doing so, the Court is aware that the father is not perfect and it is seldom that the Court finds perfect parents to whom to award the children. However, the father does not have the kind of past record that the mother has. He indicates a strong love for the child. It's true that he violated a Court

Order by grabbing the child in New York however . . . ." (Emphasis added.)

We believe it quite clear from the quoted remarks of the chancellor that, contrary to the pronouncement of the Court of Appeals in *Davis v. Davis, supra,* the lower court applied a presumption of unfitness on the basis of the wife's prior immoral conduct. In *Davis,* after a thorough review of Maryland cases concerning the effect of a parent's adulterous conduct on the award of custody, Judge Digges stated for the court:

> "We now explicitly hold what the *Pontorno* and *Neuwiller* cases implicitly recognized, *i.e.,* that whereas the fact of adultery may be a relevant consideration in child custody awards, *no presumption of unfitness on the part of the adulterous parent arises from it; rather it should be weighed, along with all other pertinent factors, only insofar as it affects the child's welfare.* We note that this view is in accord with the decisions of the majority of other courts around the country." 280 Md. at 127. (Citations omitted; emphasis added.)

In the instant appeal, the chancellor excluded from consideration in the statement of his conclusions "other pertinent factors" — that the child was, by the testimony of all the witnesses, a happy, normal, and healthy little girl; that the environment and living conditions at the home of her grandparents where she resided with her natural mother were entirely proper and adequate; that the mother was, at that time, a full-time mother and that the maternal grandmother was available to care for her should the natural mother obtain employment. The focal point of the chancellor's ruling was the prior sexual misconduct of the mother, and his finding that she had not changed, based upon the report of the investigator and the latter's testimony that the mother was not "cured." In the light of *Davis,* we find reversible error; and the proceedings on remand which we perceive to be required under that portion of the decision in *Davis* relating to "Standard of Appellate Review in Child Custody

Cases," 280 Md. at 122-126, should, we feel, be set specially for early consideration.

## III

As previously indicated, it was also contended that the chancellor erred when he denied the wife's counsel the right to cross-examine the social worker with respect to the findings in her report and her recommendation that custody be transferred to the husband.

We note that the report was prepared upon order of the court following a request by the appellee. When it was completed and filed, counsel for the parties were given the opportunity to read it in chambers, but did not receive copies. At the trial, the husband's counsel introduced the report at the commencement of his case but did not call the social worker as a witness. During the wife's case, her counsel requested permission to call the author of the report and to cross-examine her. The court ruled that the investigator, when called, would be the wife's witness and could not be impeached.

The Maryland appellate courts have not previously ruled on the precise question of whether a court-appointed investigator who has prepared a report and recommendation in a child custody case should be subject to cross-examination during the trial of the action. Based upon our consideration of the question and a review of the authorities in other jurisdictions, it is our conclusion that cross-examination in this case should have been permitted. *See* Annot., 59 A.L.R.3d 1337 (1974) and cases cited therein.

In 2 *Nelson on Divorce and Annulment* § 15.48 (2d ed. rev. 1961), it is stated: "An investigator ... must be available for complete cross-examination on any matter which he or she reports at the instance of a judge." *See, e.g., Fewel v. Fewel,* 144 P. 2d 592 (Cal. 1943); *Yearsley v. Yearsley,* 496 P. 2d 666 (Idaho 1972); *In re Rosmis,* 167 N.E.2d 826 (Ill. App. 1960); *State ex rel. Fisher v. Devins,* 200 N.W.2d 28 (Minn. 1972); *Falkides v. Falkides,* 339 N.Y.S.2d 235 (1972), *aff'd,* 356 N.Y.S.2d 231 (Sup. Ct. 1974). *See also Mazur v. Lazarus,* 196 A. 2d 477 (D.C. 1964).

In our judgment, a court-appointed investigator in a custody case occupies the position of an officer of the court, and, at the request of either party, may be called as the court's witness, subject to cross-examination by both parties.[3] *See Patterson v. State,* 22 Md. App. 13, 321 A. 2d 544 (1974), *aff'd,* 275 Md. 563, 342 A. 2d 660 (1975). The investigator may, of course, also be called by the court *sua sponte.*

> *Order of modification reversed; case*
> *remanded for further proceedings;*
> *appellee to pay the costs.*

---

**3.** We need not consider here the various situations where the court's failure to permit cross-examination of an investigator might conceivably not be reversible error. *See* Annot., 59 A.L.R.3d 1337, *supra,* at 1340-41, where it is stated:

> "[U]nder certain facts, courts have held that the right to cross-examine an investigator had been waived by stipulation, failure to timely object to the denial of, or to timely exercise, the right, or the like, or that the denial of the right was harmless error under the circumstances."