627 A.2d 30

Richard J. LEARY, III

v.

Barbara C. LEARY.

No. 1558, Sept. Term, 1992.

Court of Special Appeals of Maryland.

July 6, 1993.

Barbara R. Trader (Adkins, Potts & Smethurst, on the brief), Salisbury, for appellant.

Robert B. Fine, Salisbury, for appellee.

Argued before MOYLAN and FISCHER, JJ., and ROSALYN B. BELL, Judge (Retired) Specially Assigned.

ROSALYN B. BELL, Judge (Retired), Specially Assigned.

Appellant, Richard J. Leary, III, asks us to resolve several issues raised by his divorce from appellee, Barbara C. Leary. The main issues in this case focus on the custody of the parties' two minor children. These issues were decided by a judge in the Circuit Court for Wicomico County. Mr. Leary has appealed, contending that the trial court erred:

—in failing to enter a judgment of absolute divorce in his favor;

—in awarding Ms. Leary sole legal custody of the children when she had testified that she was asking the court to award joint legal custody;

—in failing to instruct the children's counsel as to her duties and whether that error was further magnified by counsel's failure to represent her clients adequately;

—in failing to strike the testimony and report of the children's counsel because they were hearsay;

—in failing to conduct an in camera examination of the children;

–in refusing to accept Katherine Kennan as an expert witness; and

–in awarding sole physical custody to Ms. Leary and undefined "reasonable" visitation to Mr. Leary.

After reviewing the trial judge's decision declining to award joint custody, we hold he was not clearly erroneous in making his factual findings, nor did he abuse his discretion. While we will affirm the trial judge's decisions on the issues of custody, counsel for the children, and the expert witness, we do conclude that the trial judge erred in failing to resolve the divorce issue between the parties. Hence, we remand the case to determine that issue. For purposes of clarity, we will deal with the three issues relating to counsel for the children together.

## THE FACTS

Richard and Barbara Leary married in 1973. They have two children, Brendan, age 12, and Barry, age 10. After a number of years of family discord, Ms. Leary left the family home with the children on or about January 27, 1989. Mr. Leary filed a complaint on April 26, 1989, seeking custody of the two children and a divorce on the grounds of desertion and adultery. Ms. Leary filed an answer, also seeking custody of the children and denying the desertion. On or about February 14, 1991, Ms. Leary filed a counterclaim for absolute divorce, alleging a two-year separation; Mr. Leary answered, denying that allegation. Mr. Leary later filed a supplemental complaint, alleging, in addition to the grounds originally stated, a two-year separation. The parties also sought financial relief, but resolved those issues before trial. On July 27, 1992, the trial judge issued an opinion and order granting custody of the two children to Ms. Leary. A divorce decree was not a part of that order.[1] We will recite additional facts as they become relevant.

---

1. Child support was not a part of the order either, but that is not an issue in this appeal. The court's July 27 order was appealable, however, under Md.Cts. & Jud.Proc.Code Ann. § 12–303(x) (1974, 1989

## THE DIVORCE

■ The trial judge stated in his opinion and order of July 21, 1992 that "all issues concerning absolute divorce ... have been resolved by agreement." He made no finding on the facts supporting any of the grounds alleged and entered no order of divorce. Mr. Leary contends that the trial court's statement is in error because the parties contested the grounds for divorce in their pleadings and at trial. In addition, Mr. Leary contends that the court must adjudicate the legal rights of the parties based upon the actions the parties have taken, *Flohr v. Flohr,* 195 Md. 482, 488, 73 A.2d 874 (1950), and not upon what may have been agreed.

Historically in Maryland, divorce was a legislative function, obtained only by an Act of Assembly. In 1841, the Legislature enacted the first general divorce statute, giving equity courts the jurisdiction to decree divorce on grounds of impotence, illegality, adultery, or abandonment. Since the case of *Wright v. Wright's Lessee,* 2 Md. 429, 448 (1852), the Court of Appeals has acknowledged that the equity courts' jurisdiction to grant a divorce decree is limited to the grounds specifically enumerated in the statute.

■ Grounds for an absolute divorce in Maryland have expanded to include voluntary separation, conviction of a felony, two-year separation, and insanity. Md.Fam.Law Code Ann. § 7–103 (1984, 1991 Repl.Vol.). Parties can agree to separate voluntarily and, if the agreement is executed under oath before the complaint for divorce is filed, that agreement is full corroboration of the plaintiff's testimony that the separation was voluntary. Md.Fam.Law Code Ann. § 8–104 (1984, 1991 Repl.Vol.). In the instant case, while neither party saw fit to include the "agreement" resolving the divorce issue referred to by the trial judge, we did locate a stipulation dated

---

Repl.Vol.), which allows a party to appeal from an interlocutory order that deprives "a parent, grandparent, or natural guardian of the care and custody of his child, or changing the terms of such an order."

May 7, 1992 in the transcript of the record. That stipulation does not, however, remotely relate to the grounds for divorce.

Despite § 8–104, the court may not grant a divorce based simply upon the agreement of the parties. *Dougherty v. Dougherty,* 187 Md. 21, 29–30, 48 A.2d 451 (1946). The plaintiff must testify, Md.Fam.Law Code Ann. § 1–203(c) (1984, 1991 Repl.Vol.), and that testimony must be corroborated. Md.Fam.Law Code Ann. § 7–101(b) (1984, 1991 Repl. Vol.). The court cannot simply allow the parties to agree to divorce; the court has a duty to listen to the testimony, adjudicate the legal rights of the parties, and, where appropriate, enter a judgment of divorce. *Flohr,* 195 Md. at 488, 73 A.2d 874.

Therefore, we must remand the case in order for the trial judge to consider the issue of divorce. If grounds were established by either party, the trial judge should make appropriate findings and award a decree to the proper party, specifying the grounds upon which it was based. *Borne v. Borne,* 33 Md.App. 578, 588, 365 A.2d 359 (1976). In light of our holding in *Noffsinger v. Noffsinger,* 95 Md.App. 265, 279–80, 620 A.2d 415 (1993), relative to stale testimony[2] and, in view of the substantial time that has passed since the hearing in the instant case, the trial judge should at least consider the constraints of Rule S75, as it relates to stale testimony.

---

2. In *Noffsinger,* 95 Md.App. at 279–80, 620 A.2d 415, we analyzed the facts of the case in the context of Rule S75(c), which provides:

"In an action for divorce, annulment, or alimony in which the testimony has been concluded for more than 90 days without entry of a final decree, a final decree may not be entered until supported by additional testimony justifying the conclusion that there has been no substantial change since the prior testimony was concluded."

We held that the Rule is intended to insure that nothing, which would render the granting of a divorce inappropriate, has occurred since testimony was originally taken. We also held, however, that in some instances it is "reasonable to conclude, without additional evidence, that nothing affecting the grounds for divorce occurred between the time testimony was taken and the judgment was entered." This is especially true where, as in *Noffsinger,* neither party raises the issue or claims error.

## CUSTODY

### —The Award of Sole Legal Custody Where Joint Custody Was Sought—

■ At the hearing on October 31, 1992, during direct examination, Ms. Leary stated that she wished the court to award joint legal custody:

"Q You're asking the Court to award you joint legal custody, is that correct?

"A That's correct.

"Q And you know what joint legal custody is.

"A Yes, I do.

"Q Do you believe that you and Mr. Leary can work together on major decisions affecting the children's lives?

"A Yes, I think so.

"Q Such as education.

"A Yes.

"Q And religion.

"A (Shaking head yes.)

"Q And moral values.

"A And moral values, yes."

At the hearing on May 18, 1992, however, Ms. Leary asked the court to make her primary physical custodian of the children because she felt that the children would be better off living with her in her home during the school year. Mr. Leary, on the other hand, in his pleadings sought sole custody.[3] The trial judge denied Mr. Leary's sole custody request and ordered, "Case [sic] and custody of the minor children . . . be awarded to Barbara C. Leary." Mr. Leary is unhappy about this and points to Ms. Leary's testimony to vindicate his position that the trial judge should, at a minimum, have awarded joint custody of the children.

---

3. In his brief, Mr. Leary retreats from this original position and argues that the trial court erred in not awarding joint custody.

■ The trial judge has the authority to determine custody, regardless of whether "joint custody has existed in the past, or award custody to one of the parents, or to a third person, depending upon what is in the best interests of the child." *Taylor v. Taylor*, 306 Md. 290, 301, 508 A.2d 964 (1986). The Court of Appeals in *Taylor*, 306 Md. at 296, 508 A.2d 964, stated:

> "Legal custody carries with it the right and obligation to make long-range decisions involving education, religious training, discipline, medical care, and other matters of major significance concerning the child's life and welfare."

The Court in *Taylor* went on to state that "joint legal custody means that both parents have an equal voice in making those decisions, and neither parent's rights are superior to the other." In determining the propriety of joint custody, the Court opined that "joint custody is not appropriate in every case. Indeed, it has been suggested that it is appropriate only in a small minority of cases." *Taylor*, 306 Md. at 302–03, 508 A.2d 964. The most important factor in determining whether an award of joint legal custody is appropriate is the capacity of the parents to communicate and to reach shared decisions affecting the child's welfare. According to the *Taylor* Court,

> "[r]arely, if ever, should joint legal custody be awarded in the absence of a record of mature conduct on the part of the parents evidencing an ability to effectively communicate with each other concerning the best interest of the child, and then only when it is possible to make a finding of a strong potential for such conduct in the future."

*Taylor*, 306 Md. at 304, 508 A.2d 964.

In the instant case, the trial judge had ample opportunity to observe the parties and to determine whether the parties could effectively communicate. The trial judge found, in pertinent part:

> "From the testimony, it is evident to the Court that Mrs. Leary appears to be the primary party responsible for taking the children to the dentist and the doctor and caring for their needs in this regard. She has additionally as-

sumed the costs for uncovered medical & dental expenses. (This may occur because her income is above his; Mr. Leary has not[,] however, contributed even though this has been requested.)

"The parents are both devoted and dedicated to their children; and while we will not set forth or belabor in detail the involvement of each parent in all the activities, we find them to be as set forth in each memorandum submitted by the parties.

\* \* \* \* \* \*

"The bottom line in any custody dispute is: what is in the *'best interests'* of the *children?*, *Ross v. Hoffman*, 280 Md. 172 [372 A.2d 582 (1977) ]; and a judge agonizes more about reaching the right result in a contested custody issue than about any other type of decision he renders. The agony is complicated even more when both parties are dedicated and devoted, as we have previously found these parties to be.

"We further find that neither parent is unfit and that they sincerely love their children.

"This is, however, subject to *caveat.* It is apparent to the Court—and we so find—after having heard the testimony and judged the credibility of the parties[ ] and their witnesses that Mrs. Leary is more mature than Mr. Leary who, even at this stage of his life, appears to be subject to parental domination. She is more sincere, more realistic in her approach to life and is better equipped to plan for the future best interests of the minor children, and we award her custody." (Emphasis in original.) (Footnote omitted.)

Given the fact that the parties requested different types of custody at different times in the proceedings, we wish the judge's order had defined custody more clearly. When questioned about the possibility of sharing custody, Ms. Leary testified that she thought that it would be possible. In addition, at one point she asked for "physical" custody. Mr. Leary at all times was firm in his position that he wanted sole custody of the children. We are, however, constrained to read

the judge's order in a manner that assigns the words contained in it their plain meaning.

We have reviewed the record and find ample evidence to support the award of sole legal custody to Ms. Leary. For instance, at one point near the end of the marriage, Ms. Leary suggested marital counseling, but, according to the evidence, Mr. Leary declined to participate; therefore, Ms. Leary went alone. There was also evidence that Mr. and Ms. Leary were unable to discuss their respective medical problems with each other and Ms. Leary was afraid to tell Mr. Leary of the specific date that she was moving out of the marital home based on her fear that he would physically assault her. The record is also replete with examples of the parties' lack of ability to communicate. Moreover, the evidence supports the court's finding that Ms. Leary was, and continued to be, the principal caretaker of the children.

With respect to the way decisions regarding the children were made, Mr. Leary testified that he was dissatisfied with the way Ms. Leary communicated and failed to cooperate in connection with the children's activities. Although he placed the responsibility for this situation on Ms. Leary, the trial judge did not make a finding on that point either way.

Mr. Leary argues that, by denying him joint custody, the children will be deprived of an added benefit that he is able to provide. Specifically, his airline employment permits the children to travel stand-by free of charge and the children have taken advantage of this opportunity on numerous occasions to visit family members and ejoy vacations. He contends that if he loses his status as joint legal custodian, airline regulations will not allow the children to fly at no cost and that this "would severely impact on the children's ability to maintain their ties with their paternal family." We do not comment on this particular issue as it was not before the trial judge; hence, neither he nor we could consider this allegation. Mr. Leary argues that he did not present any evidence because he was lulled into complacency, thinking that he

would have at least been named joint custodian, but that does not alter our range of review. *See* Rule 8–131(a).

Custody was sought by both parties in their pleadings and custody was the issue being tried by the court. In view of this, Mr. Leary was not justified in taking joint custody as a given. The test is not whether we would have made the same decision the trial judge made. The test is whether the trial judge was clearly erroneous in his findings—we cannot say he was; and whether, given those findings, he abused his discretion—we cannot say he did.

## COUNSEL FOR THE CHILDREN

At the conclusion of the October 31, 1992 hearing in which both parties presented their case-in-chief, but prior to any rebuttal testimony, the trial judge decided to appoint counsel for the minor children. In making the decision to appoint counsel for the children, the trial judge commented that he would not place "a whole lot of credence in talking to children" because, in his experience, the children often express preferences to live with one parent for improper or immature reasons. This action to appoint counsel was not lightly taken by the trial judge, as he had denied a prior request for such an appointment.

Mr. Leary complains that "[d]ue process requires that the parties know precisely what the role of child counsel will be from the time of his or her appointment, in order to properly prepare for, and respond to, the evidence child counsel will present." The short answer is that Mr. Leary failed to ask for such instruction when the judge stated that he was going to appoint counsel, failed to object that no specific instruction was given after counsel was appointed, and failed to object to lack of instruction when counsel testified. The more relevant answer is that, regardless of whether appointed counsel was properly instructed, she did in fact provide the trial judge with what he needed.

In a report by the Counsel for Kids Subcommittee of the Maryland State Bar Association Family Law Section (Counsel

Report), the Subcommittee noted that in practice there exists "a lack of clarity of the purpose for the appointment and the role of the attorney." The report identifies three roles that counsel for the child could fulfill: the waiver role (to decide whether to waive the patient-psychiatrist privilege for the child) *Nagle v. Hooks*, 296 Md. 123, 128–29, 460 A.2d 49 (1983); the guardian ad litem role (attorney for the child) *Levitt v. Levitt*, 79 Md.App. 394, 403–05, 556 A.2d 1162 *cert. denied*, 316 Md. 549, 560 A.2d 1118 (1989); and the role of investigator (an investigative report to the court by counsel, social worker, psychiatrist, psychologist, or trained investigator with or without recommendations) *see* Counsel Report, *supra*, at 3–4. Other roles identified for attorneys have been as mediator or as an *amicus curiae* in an independent fact-finding position. *See* Elrod, Linda D. *Counsel for the Child in Custody Disputes: The Time is Now*, 26 Fam.L.Q. 53, 57 (Spring 1992).

The Counsel Report concludes by stating that "the Court should identify the responsibilities [of the court-appointed attorney] in its order appointing counsel." Counsel Report, *supra*, at 5. Each one of the roles that an attorney for the children can assume may lead to an inherent tension between the attorney's role as advocate for the child and his or her duty to the court. In some cases, this may lead the attorney perilously close to violating the Model Code of Professional Responsibility. This subject has recently received a great deal of attention by both courts and commentators and is worth taking a closer look at since it is raised in the context of this case.

### —The Attorney As Guardian or Advocate?—

When the court appoints an attorney to be a guardian ad litem for a child, the attorney's duty is to make a determination and recommendation after pinpointing what is in the best interests of the child. Elrod, *supra*, 26 Fam.L.Q. at 59. The attorney who assumes the traditional guardian ad litem role has a responsibility primarily to the court and therefore has absolute immunity for "judicial functions," which include testifying and making reports and recommendations.

This more traditional role is defined by the court and the attorney looks to the court for direction and remuneration.[4] If, however, the attorney takes on a task that is outside of the clearly defined scope of the guardianship duties, judicial immunity may well not attach.

A dichotomy exists between the attorney as guardian and the attorney as advocate, and the lines become very easily blurred. An attorney who has been appointed by the court has to be ever mindful of the Rules of Professional Conduct. In particular, an attorney may run afoul of the dictates of Rule 1.14, which sets forth the guidelines for representation of a client under a disability.[5] The Comment that accompanies Rule 1.14 states in part:

> "The normal client-lawyer relationship is based on the assumption that the client, when properly advised and assisted, is capable of making decisions about important matters. When the client is a minor or suffers from a mental disorder or disability, however, maintaining the ordinary client-lawyer relationship may not be possible in all respects. In particular, an incapacitated person may have no power to make legally binding decisions. Nevertheless, a client lacking legal competence often has the ability to understand, deliberate upon, and reach conclusions about matters affecting the client's own well-being. Furthermore, to an increasing extent the law recognizes intermediate degrees of competence. For example, children as young as five or six years of age, and certainly those of ten or twelve, are regarded as having opinions that are entitled to weight in legal proceedings concerning their custody."

---

**4.** The court may, however, assess such costs against the litigants and often requires that deposits be made on account of such fees.

**5.** Another Rule that must be considered is Rule 1.2, Scope of Representation, which provides:

> "(a) A lawyer shall abide by a client's decisions concerning the objectives of representation, subject to paragraphs (c), (d) and (e), and, when appropriate, shall consult with the client as to the means by which they are to be pursued. A lawyer shall abide by a client's decision whether to accept an offer of settlement of a matter...."

Perhaps the best example, for purposes of illustration, is when the child expresses an interest in living with one parent, yet the attorney believes that this would not be in the child's "best interests." Does the attorney vigorously advocate the child's position as required by the Rules, or does the attorney make the decision as to what is best for the child and present that to the court? The question is more easily explored than answered. At this writing, the answer is "it depends."

There appears to be two schools of thought in answering that question: "One school holds that the child's preference is but one fact to be found, while the other maintains that without full advocacy of the preference there would be little reason to have a child's representative at all." Note, *Lawyering For the Child: Principles of Representation in Custody and Visitation Disputes Arising from Divorce,* 87 Yale L.J. 1126, 1141 (1978). An intermediate view suggests that there should be a "continuum of roles rather than the extremes of advocate and factfinder." 87 Yale L.J., *supra,* at 1141.

In a study of 18 Connecticut attorneys who had received appointments as counsel for children in divorce-related disputes, the researchers observed that some of the attorneys would characterize their role as either advocate or factfinder, yet they would discuss responsibilities that were inconsistent with the characterization. 87 Yale L.J., *supra,* at 1146. Those attorneys who stated that they served an advocate's role explained that this meant representing the child the way that they would an adult client. 87 Yale L.J., *supra,* at 1146. These same "advocates," however, also stated that there were instances in which they felt compelled to serve child-protective functions, which included counselling the parents, attending to the child's emotional needs during the litigation, and, in one extreme instance, making a recommendation that was the direct opposite of what the child/client wanted. 87 Yale L.J., *supra,* at 1147.

One attorney who was questioned during the study described his role as that of an advocate; however, upon questioning, it was determined that the attorney never discussed

or discerned his client's custodial preference. 87 Yale L.J., *supra*, at 1149. Instead, the attorney stated that he spent his time with the parents trying to concentrate on a resolution "in which the 'losing parent' would not feel 'terribly embittered, vilified.' " 87 Yale L.J., *supra*, at 1149. The Yale article concludes that this type of deviation from a pure advocacy role might not be such a bad thing:

> "Attorneys who identified themselves as advocates had clear conceptions of that role. An advocate should work to persuade the court to follow the client's preference by making motions, asserting arguments, drawing stipulations, and taking appeals if necessary. An advocate should help the adversary process by freeing parents' lawyers to give their clients undiluted loyalty. In practice, however, these attorneys performed in ways not suggested by their own role conceptions. They ignored, evaluated, or rejected the preference of the child; they worked to gather all available facts and sometimes did not advance a position to the court; they mediated between and counseled parents and tried to help them develop realistic perspectives. By responding to the needs of children in the process as well as in the outcome of adjudications, these attorneys may have advanced the interests of their clients more than would an attorney who limits himself to advocacy."

87 Yale L.J., *supra*, at 1150.

The Yale authors also examined the role of attorneys who identified their tasks as aiding the court by fact finding. Some of the members of this group stated that their role was to "take on advocacy, counseling, and mediating responsibilities." 87 Yale L.J., *supra*, at 1150. Others explained that their roles were to make sure that the court had all the facts available. In doing so, one attorney surveyed "investigated allegations of abuse, tracked down police records of a mother's boyfriend, and questioned neighbors to check out the stories given by both sides." 87 Yale L.J., *supra*, at 1151.

> "In sum, attorneys who labeled themselves factfinders frequently described ways in which they evaluated evidence, shaped an argument for the court, decided to curtail an

investigation, and negotiated settlements. The one attorney who confined himself to investigation concluded that this failed to protect the interests of the child. For the other attorneys, who went ahead and took on duties other than factfinding, the theoretical role conceptions proved simply irrelevant and were discarded unnoticed as the attorneys responded to their perceptions of the child's interests." 87 Yale L.J., *supra*, at 1153.

Recognizing that there is a growing need to define more clearly an attorney's role in custody disputes, the American Bar Association is looking toward drafting standards. Also the bar associations in various states, such as Connecticut, are in the process of drafting their own individual guidelines. The federal government, under the auspices of the Department of Health and Human Services, undertook a year-long study beginning in the summer of 1992 to study the way children are represented in court on a nationwide basis. The study includes a comparison of the effectiveness of lawyers to court appointed guardians ad litem, who are either lawyers or trained lay volunteers. *See* Jan Hoffman, *When a Child–Client Disagrees With the Lawyer*, N.Y. Times, August 15, 1992, at Law Section.

In the meantime, Elrod, 26 Fam.L.Q., *supra*, at 67–69, suggests:

"To be effective, a child's counsel needs a clear definition of the role to be performed, adequate training, reasonable compensation, and supervision.

. . . . .

"Minimum experience requirements, training standards, and performance expectations must be adopted. Appointing inexperienced counsel to represent a child when both parents are represented by experienced counsel amounts to inadequate representation for the child. While only Wisconsin has statewide standards for guardians ad litem, several states are in the process of developing standards or have them in place in some counties. In addition to training in child advocacy, counsel should be required to complete a

basic course in mediation. The child's counsel should have a basic understanding of developmental phases of children as well as an understanding of the effect on children of various custody and visitation arrangements.

\* \* \* \* \* \*

"In divorce and paternity cases, the cost of the child's counsel can be added to costs of the case when parents can afford it. Colorado currently allows the court to apportion costs of the guardian ad litem between the parents. New Hampshire allows the court to apportion responsibility for payments between the adult parties with the court paying if the parents cannot. Anecdotal information from a number of lawyers suggests that where the parents are well off and the issues difficult, at least some trial judges appoint attorneys or guardians and order the parents to pay them on their own authority.

"A public child-counsel system would provide the best trained, most competent pool of guardians.... Federal and state governments could provide incentives to set up a public counsel program for children, while parents with the ability to pay could be charged, or an additional charge could be added to the divorce filing fee."

There has been little discussion in Maryland of the role an attorney should play in custody cases. In *Levitt,* 79 Md.App. at 403, 556 A.2d 1162, we established the importance of child counsel in contested custody matters, sending the trial courts a message on "what child counsel's role should be." We do not retreat from that perspective and encourage trial judges to tell their appointed attorneys what they expect— waiver, pure representation, pure investigation, or a combination.

This Court, in *Van Schaik v. Van Schaik,* 90 Md.App. 725, 733–36, 603 A.2d 908 (1992), discussed the extent to which the findings of counsel for the child should be kept confidential. In addition, we held that appointed counsel did not have the authority to initiate a proceeding for the recovery of the child's property and could not keep psychological reports and

evaluations of the child confidential where the child had indicated that he had contemplated suicide. *Van Schaik,* 90 Md.App. at 733–36, 603 A.2d 908.

In *John O. v. Jane O.,* 90 Md.App. 406, 435–36, 601 A.2d 149 (1992), we were asked to decide whether the child's counsel failed to advocate the position adopted by the child. Counsel for the child in *John O.* had been appointed by the court; however, from the record provided to us in the case, it was not clear whether the court had defined what role it wanted counsel to play. Counsel took the middle ground, presenting to the court both the child's position and what counsel, based on a review of all of the evidence, believed was in the best interests of the child. *John O.,* 90 Md.App. at 436, 601 A.2d 149.[6] Absent firm guidelines from the Legislature or other sources, the best solution to the question would appear to lie in precise, clear-cut orders by the court after input from counsel.

### —Counsel for the Leary Children—

 In the instant case, the trial judge did not enter an order stating the purpose for the appointment. While it would have been preferable for him to have done so, we do not conclude that the omission in this case was fatal. It is obvious here that the appointment was not for a *Nagle v. Hooks* waiver, as there was no waiver issue. In stating that he was going to appoint counsel, the trial judge commented that he did not put a lot of credence in talking to the children, or in a

---

6. In *John O.,* the child, a boy who had been adopted by the parties before they divorced, had expressed a strong preference to live with the father. There was evidence, however, that the father was a pedophile and that, one time during an unsupervised overnight visit, he had fondled the child. Based on all of the evidence, including the reports of various social workers and psychologists, the court appointed attorney told the court that he thought that giving the father custody would not be best for the child. The court made it very clear that it was going to make its own decision about custody based on all of the evidence, but allowed the attorney to present all relevant factors, including what the child wanted. The position adopted by the attorney in *John O.* represents the middle ground between advocate and fact finder, which the Yale article indicates may be a role that attorneys are often forced to take, given the circumstances of the case.

simple statement of the children's preference, without a look at the reasons underlying the preference. He also said that he was concerned with the children and their best interests. His comments set the guidelines and indicated the elements he wished counsel for the children to look at and the subsequent testimony of the children's representative met those purposes.

Ms. Coates, the children's appointed counsel, attended the May 18 continuation hearing. She did not take a major role in the hearing, but did make some inquiries. After all of the evidence was in, the trial judge ordered Ms. Coates to submit a written report and to provide a copy to the parties so they would have an opportunity to review the report prior to its being admitted into evidence. The trial judge asked counsel if they were satisfied with that procedure and they assented.

On May 29, the case was resumed. The trial judge struck that part of the report in which Ms. Coates made a recommendation and called Ms. Coates to testify. Ms. Coates and counsel for Ms. Leary both advised the trial judge and Mr. Leary that the children were available to testify if so requested. In her role as counsel for the children, Ms. Coates testified:

"Q: (By [Mr. Leary's] counsel) So, what would be in the best interest of the boys was not your concern?

"A: (By [Ms.] Coates) I wouldn't say it was not my concern, I would say it was not my decision to make. I viewed my role in this case based on the posture of the case when I came in it and the age and intelligence of the children to be one of attorney advocate, to simply convey what the desires and wishes of the nine and thirteen year old boys were as opposed to possibly a guardian ad litem or an investigator."

She further testified:

"A: I would have to say that the way that I handled this matter was that I initially find out what the children's desires are and then I do look beyond that when I'm discussing things with them if there is anything that would

make me suspect that their desires are not properly motivated."

Ms. Coates's role as counsel to the children was clearly designed to assist the trial court in finding the children's preferences and to determine whether the expressed preferences were properly motivated.

 The preference of the child or children is a relevant factor for the court to consider when awarding custody. *Ross v. Pick,* 199 Md. 341, 353, 86 A.2d 463 (1952); *Montgomery County Dept. of Social Services v. Sanders,* 38 Md.App. 406, 420, 381 A.2d 1154 (1978). In *Ross,* 199 Md. at 353, 86 A.2d 463, the Court of Appeals stated:

"[T]he child's own wishes may be consulted and given weight if he is of sufficient age and capacity to form a rational judgment.... But we adopt a rule that there is no specific age of a child at which his wishes should be consulted and given weight by the court. The matter depends upon the extent of the child's mental development. The desires of the child are consulted, not because of any legal rights to decide the question of custody, but because the court should know them in order to be better able to exercise its discretion wisely. It is not the whim of the child that the court respects, but its feelings, attachments, reasonable preference and probable contentment."

When a child is of sufficient age and has the intelligence and discretion to exercise judgment as to his or her future welfare, based upon facts and not mere whims, those wishes are one factor that, within context, should be considered by the trial judge in determining custody.

Mr. Leary also complains that "Ms. Coates clearly perceived her role to be that of 'mouthpiece,' not guardian *ad litem* or investigator"; her purpose, as she perceived it according to him, was "to simply convey to the Court what the desire of the nine and thirteen year-old boys were...." [7] We do not agree.

---

7. Mr. Leary points out that Brendan, "whose name Ms. Coates never did learn to spell, did not turn thirteen until after Ms. Coates' last

Ms. Coates concluded that, based on the *posture of the case and the age and intelligence of the children,* her role was that of conveying "the desires and wishes" of the boys. She described two very intelligent young boys who were outgoing, doing well in school, and able to express their preferences. She was not acting strictly as an advocate of their position, but as a conveyer of their preferences, which she concluded were not improperly motivated. In other words, the circumstances forced her to take the middle ground between advocacy and fact finding.

Ms. Coates investigated what the trial judge wanted to know—namely, the children's preferences—but it was the trial judge, not Ms. Coates, who concluded that joint custody was not to be. In fact, although her recommendations were struck, Ms. Coates concluded that joint custody would be appropriate. We fail to see how the lack of articulated directions by the trial judge, even if preserved, hurt Mr. Leary.

Mr. Leary also complains of ex parte communications between Ms. Coates and the court. We have no record of any such communications and, hence, have no basis upon which to consider the issue.

### —Report of the Children's Counsel—

At the commencement of the May 29 hearing, Mr. Leary moved to strike the portions of Ms. Coates's report that contained hearsay evidence. The trial judge replied that he "could ferret [the hearsay] out." Investigative reports are inevitably based on hearsay as is the testimony that is based on such a report.

There is precedent to permit hearsay testimony in such a case. In *Draper v. Draper,* 39 Md.App. 73, 91, 382 A.2d 1095 (1978), this Court held, in a custody case, that a court-appointed investigator from the Department of Social Services

---

meeting with him." We do not see these points important enough to invalidate her representation.

occupied a position of an officer of the court. At the request of either party, such a witness may be called as a court's witness subject to cross-examination by both parties when presenting his or her report to the court. In *Draper,* the report contained references to discussions with the parties to the case, the child, and relatives.

 ■ In *Denningham v. Denningham,* 49 Md.App. 328, 335–36, 431 A.2d 755, *cert. denied,* 291 Md. 773 (1981), *cert. denied,* 455 U.S. 990, 102 S.Ct. 1614, 71 L.Ed.2d 849 (1982), we held that child custody reports often consist largely of hearsay declarations. We went on to say that child custody reports often contain double- or triple-level hearsay, as well as opinions of various social workers, medical or paramedical personnel, psychologists, teachers and the like, which may or may not have a reasonable basis. Generally, these reports are not under oath and often emanate from people having an overt or covert bias. Where the trial judge bases the custody decision, even in part on an independent report, the parties and/or their attorneys must be given the opportunity to examine the report, and must be allowed the opportunity to cross-examine the investigator and produce outside witnesses to establish any inaccuracies that report may contain.

 Four days after the conclusion of the May 29 hearing, Mr. Leary moved to strike the report and the testimony of Ms. Coates as it pertained to the alleged desires of the minor children. The motion to strike Ms. Coates's testimony comes too late. Rule 2–517. If Mr. Leary thought her report and testimony were unreliable, he could have and should have called the children as witnesses.

 Mr. Leary's attorney extensively cross-examined Ms. Coates. He could have cross-examined Ms. Coates on her opportunity to speak with the children, *i.e.,* the number of meetings, the length of interviews, whether any undue influence was used by either parent, and whether the boys' preferences were motivated by any improper reason. Counsel had a copy of her report in his possession prior to Ms. Coates's testimony. Although he could have, Mr. Leary chose not to

call the children as witnesses, and the trial judge could make such inference as he wished from that decision.

### —Trial Court's Meeting With the Children—

After the court concluded its hearing on May 29, 1992, Mr. Leary filed a Motion for In–Camera Examination of Children. He argued that the representation of the children's counsel had been inadequate and that the children's wishes had not been accurately presented to the court. The court decided the motion in its opinion and order, stating only that it declined in its discretion to interview the children.

The law in Maryland is clear that the trial court has the discretion to interview a child, with or without the consent of the parties, and with or without the presence of counsel. *Marshall v. Stefanides,* 17 Md.App. 364, 369, 302 A.2d 682 (1973). In disputed custody cases, the court has the discretion whether to speak to the child or children and, if so, the weight to be given the children's preference as to a custodian. *Casey v. Casey,* 210 Md. 464, 474, 124 A.2d 254 (1956).

The trial judge received the information he concluded he needed and, in his discretion, made his decision. Unlike *Levitt,* 79 Md.App. at 404, 556 A.2d 1162, where no one had spoken to the child, the children's preferences were clearly before the court for its consideration. Mr. Leary presented no evidence at trial, or later, to establish that the children's preferences were misrepresented to the trial court by counsel for the children. We see no abuse of discretion.

### AN EXPERT WITNESS

Mr. Leary urges that he should have been permitted to present Katherine Kennan as an expert witness. She stated in voir dire that she had been asked to make "a knowledgeable, psychological assessment of the boys and parents and, if asked, give her opinion on the best interests of the children." Mr. Leary states in his reply brief that she was "proffered as an expert in the area of family counseling, not on the ultimate issue." The court declined to find that she was

an expert in family counseling. It did permit her to testify as a fact witness, however, and counsel had ample opportunity to bring out her observations. We do not have any idea what her expert testimony would have been had she been accepted as an expert witness in family counseling because counsel never proffered what it would be. McLain, *Evidence* § 103.17 (1987, Supp.1992).

The admissibility of expert testimony "is a matter largely within the discretion of the trial court, and its action will seldom constitute a ground for reversal." *Radman v. Harold,* 279 Md. 167, 173, 367 A.2d 472 (1977); *Air Lift, Ltd. v. Board of County Commissioners,* 262 Md. 368, 401, 278 A.2d 244 (1971). In the instant case, as to Ms. Kennan's qualifications, she did not have her master's degree and she had no certificate; she had never been accepted by any court as an expert, according to her own statement. Moreover, the trial court had independent knowledge concerning what was in the best interests of the children, having heard from the parties and their witnesses. The court would hear from the children's counsel later.

In *Sanders,* 38 Md.App. at 423, 381 A.2d 1154, we stated:

"Reliance upon 'the auxiliary services of psychiatrists, psychologists, and trained social workers ... should not be too obsequious or routine or the experts too casual.'" (Citation omitted.)

Even if the objection was preserved, we cannot say that the trial judge abused his discretion.

### SOLE CUSTODY

The trial judge awarded sole physical custody to Ms. Leary and reasonable visitation to Mr. Leary. Mr. Leary posits that the parties and the children had successfully maintained a joint custody arrangement for almost three-and-one-half years. He argues that this amounted to a *de facto* custody arrangement. Hence, custody should be reviewed as if it were a modification of a previous custody order, not an original order. That is simply not the law. Custody *pendente*

*lite* or *de facto*, prior to the court's ultimate decision, is subject to review on the basis of a primary award, not as a modification. The standard is and continues to be what is in the best interests of the child. *McCready v. McCready*, 323 Md. 476, 481, 593 A.2d 1128 (1991); *Kerns v. Kerns*, 59 Md.App. 87, 97, 474 A.2d 925 (1984) (no need to show a change of circumstances following a *pendente lite* order).

Mr. Leary contends that, if the court's opinion is arbitrary or clearly wrong, it will not be accorded the deference ordinarily due the decision of a trial judge; it will be reversed. *Hanke v. Hanke*, 94 Md.App. 65, 71, 615 A.2d 1205 (1992) (decision of trial court to allow overnight visitation was clearly wrong and was reversed). We agree.

Mr. Leary then claims that the trial judge's opinion is based on one finding of fact, namely, that Ms. Leary was "more mature" than Mr. Leary appeared to be, "even at this stage of his life ... subject to parental domination." That may be good advocacy, but it is less than candid. The trial judge said:

> "[A]fter having heard the testimony and judged the credibility of the parties[ ] and their witnesses that Mrs. Leary is more mature than Mr. Leary who, even at this stage of his life, appears to be subject to parental domination. She is more sincere, more realistic in her approach to life and is better equipped to plan for the future best interests of the minor children, and we award her custody." (Footnote omitted.)

Evidencing that maturity, Ms. Leary provided the principal support for the family and was the primary care giver for the children throughout a substantial part of the marriage. She took unpaid leave of six months at the birth of each of the children, despite the fact that Mr. Leary only worked one month while she was on maternity leave with Brendan and was out of work for the full time while she was on maternity leave with Barry.

In *McCready*, 323 Md. at 484, 593 A.2d 1128, the Court of Appeals held that appellate courts will not set aside factual

findings made by the chancellor unless clearly erroneous. The Court declined to interfere with the decision regarding custody because it was founded upon legal principles and there was not a clear showing that the chancellor abused his discretion. Interestingly, in *McCready*, the trial judge granted custody to the father, holding that the mother was less mature than the father and "less realistic in her approach to life." *McCready*, 323 Md. at 485, 593 A.2d 1128. Consequently, he struck down a joint physical custody arrangement that had been in place for a substantial period of time. *McCready*, 323 Md. at 485–86, 593 A.2d 1128. In the instant case, the trial judge had an opportunity to hear Mr. Leary and his parents and make his own assessment of their involvement in their sons' life. Counsel suggests that the trial judge erred if he considered a comment that Mr. Leary's father called Ms. Coates "to intimidate and/or harass her." Counsel does not suggest that the call did not occur or was for another reason.

Mr. Leary's counsel also argues that the trial court should not have disturbed the previously successful joint custody arrangement. The testimony of Ms. Leary revealed that the children were not satisfied with the present custody arrangement, nor were the parents. We see no factual predicate for the argument that the previously scheduled custody arrangements were so satisfactory that the court could not alter them.

Finally, Mr. Leary requests that we hold that the trial court's order of reasonable visitation is fundamentally unfair. We agree with Mr. Leary that a definitive visitation schedule is preferable where the parties are unable to structure their own. We agree that the best interests of the children are better served by a structure, but one that permits flexibility if the parents are able to handle it. The parents should take appropriate steps to establish a parenting plan, a plan that takes into consideration the needs of the children at their present age and development, including appropriate access to their parents. Access or visitation follows logically from such a plan. On remand, if the parents are unable to

agree to a parenting plan that specifies access times, the court should establish a suitable schedule of access and visitation.

**JUDGMENT AFFIRMED IN PART AND REMANDED INSOFAR AS IT RELATES TO ENTRY OF A DIVORCE DECREE. COSTS TO BE PAID SIX/SEVENTHS BY APPELLANT AND ONE/SEVENTH BY APPELLEE.**